IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| RESHONDA SANDERS, as Administrator of the ESTATE OF DONNIE SANDERS <br><br> Plaintiff, <br><br> v. <br><br> BLAYNE NEWTON <br><br> And <br><br> MARK TOLBERT <br><br> And <br><br> CATHY DEAN <br><br> And <br><br> DON WAGNER <br><br> And <br><br> QUINTON LUCAS <br><br> And <br><br> NATHAN GARRETT <br><br> Defendants. | Civil Action No. <br><br> **JURY TRIAL DEMANDED** |

## PLAINTIFF'S COMPLAINT

NOW COMES Reshonda Sanders, as Administrator of the Estate of Donnie Sanders, complaining of Defendants Blayne Newton, and Kansas City Board of Police Commissioners Mark Tolbert, Cathy Dean, Don Wagner, Quinton Lucas, and Nathan Garrett and for cause would show the Honorable Court as follows:

1. On March 12, 2020, Blayne Newton shot and killed Donnie Sanders as he was unarmed and running away from Newton.

2. This is an action brought by the Plaintiff against Defendants Blayne Newton, and Kansas City Board of Police Commissioners Tolbert, Dean, Wagner, Lucas, and Garrett for Newton's use of excessive and deadly force under the color of state law resulting in the death of Donnie Sanders in violation of his rights under the Fourth Amendment of the United States Constitution.

3. Plaintiff brings this action pursuant to Missouri's wrongful death and survivor statutes on behalf of all heirs and wrongful death beneficiaries.

4. Plaintiff alleges Defendant Police Commissioners failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise properly equip and control officers including those who are known, or who should have been known, to engage in the use of excessive force and/or deadly force.

5. Defendant Police Commissioners had a duty, but failed to implement and/or enforce training, policies, practices and procedures for the Kansas City Police Department that respected Donnie Sanders' constitutional rights.

6. Defendant Police Commissioners failure to adequately supervise, discipline, and train Defendant Newton, failure to implement the necessary policies and procedures, and affirmative implementation of unconstitutional policies caused Donnie Sanders' unwarranted and excruciating physical and mental anguish and death.

7. Defendant Police Commissioners were aware of the failures and the likelihood that these failures would result in the violation of the constitutional rights of inhabitants but failed to take any steps to rectify these failures.

8. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks redress and compensation for damages and the wrongful death of Donnie Sanders.

**PARTIES**

9. Plaintiff Reshonda Sanders is the duly appointed administrator of the Estate of Donnie Sanders.

10. Defendant Blayne Newton was at all relevant times a patrol officer with the Kansas City Police Department.

11. Defendants Tolbert, Dean, Wagner, Lucas, and Garrett were at all times Commissioners of the Kansas City Board of Police Commissioners. The Kansas City Board of Police Commissioners is the board appointed by the Missouri State government appointed to oversee the operations of the Kansas City Police Department. The Kansas City Board of Police Commissioners are the final policymakers of the Kansas City Police Department in areas of operations, training, discipline, hiring, organization, and structure.

**JURISDICTION AND VENUE**

12. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth Amendment rights of the decedent Donnie Sanders. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

13. Venue is proper in this Honorable Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Western District of Missouri.

### THE KILLING OF DONNIE SANDERS

14. On or about, March 12, 2020, Defendant Newton was working as a patrolman with the Kansas City Police Department.

15. On that date around 11:00PM, Defendant Newton pulled over a vehicle driven by Donnie Sanders for a routine traffic violation near an alley by 51st Street in Kansas City.

16. After pulling over, Sanders exited his car and began running away from the stop.

17. Defendant Newton chased after Sanders for about one block.

18. Then, Defendant Newton can be heard on his microphone recording repeatedly yelling at Mr. Sanders to "drop it."

19. However, Mr. Sanders had nothing on him to drop.

20. Defendant Newton then discharged his firearm five times, striking and killing Donnie Sanders.

21. No gun or weapon of any kind was recovered.

### FAILURES OF THE KANSAS CITY POLICE DEPARTMENT

22. The Kansas City Police Department has a long and well documented history of utilizing excessive and often deadly force.

*Systemic Issues*

23. Between 2005 and the present, the Kansas City Police Department displayed a consistent and systematic failure to properly train and supervise its officers on the proper use of force, and techniques and principles of de-escalation, resulting in numerous incidents of officers unnecessarily using force resulting in serious bodily injury and death, particularly against people of color.

24. Further, Kansas City's training emphasized an "us-against-them" mentality and a desire to take care of fellow officers over the just and fair enforcement of the law.

25. This mentality was most prominently displayed in a 2019 KCPD training PowerPoint on fatal police shootings which strikes a defensive and argumentative tone while training officers that media coverage of police shootings are unfair and unreasonable, and that officer's problems are made worse by leaders who "made concessions" to "appease the inaccurate perceptions of the public." The training went on to tell officers not to feel guilty about killing citizens because they are "the winner in a competition in which the winning prize is their life."

26. The Department also demonstrated tolerance of officer misconduct through its refusal to conduct meaningful investigations of the use of excessive and deadly force by its officers and the resultant lack of discipline for officers who violate civil rights.

27. The Department's investigatory policies are demonstrative of this.

28. The Department refuses to investigate any complaint of excessive force that is made more than 90 days after the incident.

29. This means that misconduct goes unreviewed if the victim takes more than three months to recover from their injuries, to work up the courage to file a complaint, or simply to learn about the complaint process.

30. The Department also only permits victims to file a complaint. Witnesses who observe police misconduct cannot file a complaint.

31. KCPD also requires administrative hurdles before a complaint will be accepted, such as requiring the complaint to be notarized.

32. Further, even when complaints are timely filed and notarized and investigations launched, Chief Rick Scott has demonstrated a consistent practice of reinstating officers to active duty while investigations into their roles in excessive force and fatal shooting cases are ongoing.

33. This practice conveys the message to officers that they will not be disciplined for their misconduct and to the public that their complaints are pointless and that the investigation is merely perfunctory.

34. Additionally, Chief Scott has used his authority to reject routine requests for criminal complaints against police officers.

35. While providing probable cause statements to prosecutors is a routine and unquestioned practice when it involves normal citizens, Chief Scott has stated that he will never provide probable cause statements in officer-involved incidents investigated by the KCPD.

36. This position is particularly egregious given that Chief Scott and the KCPD refuse to allow outside agencies to investigate officer involved shooting.

37. Chief Scott's actions in withholding probable cause statements in investigations into police officers are designed to and have the effect of hindering investigation into misconduct.

38. In a letter addressed to Chief Scott and penned by Jackson County Prosecutor Jean Peters Baker, Ms. Baker expressed her concern with Chief Scott's actions stating, "By withholding a probable cause statement for an officer-involved incident, you are blocking the prosecutor's independent review of the facts under the law… Our system of government depends on checks and balances and oversight. Without such, the public will not have confidence in our decisions."

39. These policies and practices have served the purpose of conveying to officers that the use of excessive and deadly force is accepted and condoned by the Kansas City Police Department.

40. Indeed, Kansas City Councilman Eric Bunch acknowledged as much when he recently publicly declared "officer brutality is common under [Chief] Smith's leadership" while calling for the Chief's resignation.

*Ryan Stokes*

41. On July 28, 2013, a drunk man falsely accused Ryan Stokes of stealing his phone prompting KCPD officers to chase after Stokes.

42. During the chase, KCPD officer William Thompson shot Ryan in the back multiple times killing him.

43. KCPD released a promulgated a story that Stokes was a thief who was armed, but June 2017 deposition testimony from former Officer Daniel Straub brought the truth to light – that Stokes was innocent, unarmed, and shot in the back.

44. In the two years following his testimony, Straub was aggressively pressured by supervisors and fellow officers into resigning from the KCPD and did so in September of 2019.

### Breona Hill

45. In May of 2019, Breona Hill was viciously assaulted and slammed to the sidewalk by KCPD officers Matthew Brummett and Charles Prichard.

46. The involved officers reported that Ms. Hill was taken to the ground in order to take her into custody, but a video of the incident demonstrated that the officers repeatedly slammed Ms. Hill's face into the sidewalk and kneed her in the neck and torso.

47. An internal KCPD investigation found no misconduct.

48. However, an investigation by the Jackson County Prosecutor found that assault charges were warranted.

49. Chief Scott refused to allow a probable cause statement to be issued against the officers.

50. As a result, a grand jury had to be impaneled to consider the charges.

51. The grand jury later indicted the officers.

### Anthony Contreras

52. In June of 2014, Anthony Contreras took off running after being approached by KCPD Officer Jacob Ramsey.

53. Even though Contreras was unarmed, Ramsey shot him in the back.

54. The department did not return a probable cause statement against the officer, again requiring a grand jury to be impaneled.

55. The grand jury returned an indictment on felony assault and armed criminal action charges.

56. The charges were eventually dropped before trial.

57. A civil lawsuit resulting from the incident was subsequently settled for $475,000.

58. Nonetheless, KCPD returned Ramsey to active duty.

*Cameron Lamb*

59. In December 2019, Cameron Lamb was shot and killed in his own garage after KCPD Detectives entered onto his property without a warrant or permission and Eric DeValkanaere shot him while he was backing his truck into the garage.

60. An investigation revealed that Cameron was unarmed at the time and posed no threat to DeValkanaere.

61. The investigation further revealed that KCPD officers likely planted a gun on the scene in an attempt to cover-up the killing.
In keeping with his practices Chief Scott refused to return an affidavit of probable cause to the District Attorney.

62. An internal investigation by KCPD cleared DeValkenaere of any wrongdoing.

63. A grand jury was impaneled and indicted DeValkenaere.

64. DeValkenaere was convicted of second-degree manslaughter and armed criminal action.

65. Consistent with their culture of unaccountability and despite the conviction, DeValkenaere and the Police Commissioner Defendants have continued to deny any wrongdoing in a civil suit brought by Mr. Lamb's family.

*Terrance Bridges and Unidentified 15-year-old Boy*

66. In May of 2019, KCPD Officer Dylan Pifer shot and killed Terrance Bridges.

67. Bridges was unarmed at the time of the killing.

68. Unsurprisingly, KCPD found no issues with the killing and Pifer was returned to active duty just nine days after the shooting.

69. Just six months later, Officer Pifer and his partner Sergeant Matthew Neal viciously assault an unidentified 15-year-old boy by restraining him and repeatedly slamming the boy's face into the ground, breaking his teeth and causing him to need six stitches in his forehead.

70. A complaint was timely filed with KCPD and initially Pifer and Neal were found to have used excessive force.

71. Then, Chief Scott intervened and mandated that the complaint against Pifer be dropped.

72. As a result, no record of the incident will appear in Pifer's personnel file.

73. Further KCPD refused to return a probable cause statement against Pifer or Neal.

74. As a result, a grand jury was impaneled and Neal was indicted on third degree assault. Those charges remain pending.

75. A civil lawsuit stemming from the assault settled for nearly ¾ of a million dollars.

76. Pifer remains on the KCPD force.

*Michael Simmons and Manuel Palacio*

77. In May of 2014, KCPD Officer Shannon Hansen pulled over Michael Simmons.

78. In his police report, Hansen claimed that Simmons had to be forced from the car after ignoring officer commands.

79. However, dash camera footage of the incident demonstrated that to be a lie.

80. Hansen approached the car and pulled Simmons out without ever giving a command.

81. Hansen then forced Simmons to the ground and threatened he would "take a knife and I'm going to cut your throat from ear to fucking ear."

82. A civil lawsuit from the incident was settled for $75,000.

83. Despite video evidence of Officer Hansen's excessive force and unprofessional language, and indisputable evidence that he lied on a police report, Hansen was not arrested or disciplined.

84. That same day, Manuel Palacio was arrested for a robbery also by Officer Hansen.

85. When KCPD officers arrived on scene, Palacio immediately dropped to the ground and was handcuffed by officers.

86. Then, minutes after, Officer Shannon Hansen viciously assaulted Palacio by repeatedly punching the handcuffed man in the head and verbally abusing and threatening him.

87. As a result of the incident, a civil lawsuit was settled for $300,000.

88. This vicious assault was caught on video as well.

89. Nonetheless, Officer Hansen was not arrested or disciplined.

90. Nor was Officer Hansen was not terminated from the KCPD.

*Phillippe Lora*

91. In November 2013, KCPD officers were investigating a carjacking when Phillippe Lora began to drive away in his SUV.

92. KCPD officers opened fire, discharging at least 21 times striking and killing Lora.

93. Lora had committed no crime, was unarmed, and had not threatened the officers or anyone else.

94. KCPD officers claimed they heard gunshots which prompted them to open fire on Lora, but this was demonstrated to be false as no weapon was recovered.

95. The incident resulted in a $4.8 million dollar settlement.

96. Despite their killing of an unarmed man and the massive settlement, the discharging officers – Dakota Merrill and Shane Mellot – were not terminated and remain with the department.

*Josh Bills*

97. In December of 2013, Josh Bills was walking near his home when five KCPD officers approached him responding to a call about a suspicious "Black man, black clothing."

98. Without warning, one of the officers kicked Bills' legs out from under him, smashing his face into the concrete.

99. The officers faced no internal discipline, nor was a probable cause statement returned against any of them.

100. The incident led to a lawsuit by the ACLU of Missouri on Mr. Bills' behalf.

## **WRONGFUL DEATH ACTION**

101. Plaintiff brings these claims pursuant to the Missouri Wrongful Death Statute, § 537.080 Mo.R.Stat., on behalf of those persons entitled by law to recover damages as a result of the wrongful death of Donnie Sanders

102. No other action has been brought to recover for Donnie Sander's death under the aforementioned statute(s).

103. Plaintiff claims all available damages under the Missouri Wrongful Death Statute.

## **SURVIVAL ACTION**

104. Plaintiff brings these claims pursuant to the Missouri Survival Statute 537.020

Mo.R.Stat., on behalf of the Estate of Donnie Sanders.

105. No other action has been brought to rec for Donnie Sander's death under the aforementioned statute(s).

106. Plaintiff claims all available damages under the Missouri Survival Statute.

## COUNT I: FOURTH AMENDMENT VIOLATION
## AGAINST DEFENDANT NEWTON

107. Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

108. Plaintiffs would show that Defendant Newton violated Donnie Sanders' Fourth Amendment rights when he shot and killed Sanders.

109. Newton failed to act as an objectively reasonable officer would have acted in the same or similar circumstances. That is, Defendant Newton, without justification and the need to do so pointed his firearm at an unarmed Donnie Sanders' and discharged five times, killing him.

110. The excessive and deadly force used by Defendant Newton was not objectively reasonable, justified, nor was it necessary under the circumstances.

111. Plaintiff would show that Defendant Newton denied Sanders of his right to be free from the use of excessive force in violation of the 4th Amendment to the United States Constitution.

112. Defendant Newton embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact, caused Sanders to suffer extreme and severe mental and emotional distress, anxiety, terror and agony.

113. Plaintiffs seek all available wrongful death and survival damages under the law.

**WHEREFORE**, Plaintiff demands judgement in her favor, and against Defendant Newton, pursuant to 42 U.S.C. 1983, in an amount in excess of $10 million dollars, including interest, delay damages, costs of suit, general and specific damages, punitive and exemplary damages as provided by law, attorneys' fees under U.S.C 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

## COUNT II: MUNICIPAL LIABILITY
### AGAINST DEFENDANTS KANSAS CITY BOARD OF POLICE COMMISSIONERS TOLBERT, DEAN, WAGNER, LUCAS, AND GARRETT

114. Plaintiffs hereby incorporate all preceding paragraphs as if fully stated herein.

115. The customs, practices, and policies of the Kansas City Police Department were a moving force behind Defendant Newton's violation of Donnie Sanders' constitutional rights.

116. Sanders was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the Municipal Defendants through its many failures addressed *supra*.

117. The policymakers, Board of Police Commissioners Tolbert, Dean, Wagner, Lucas, and Garrett were aware of the failures of the Kansas City Police Department as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the people of Kansas City.

118. These failures and the refusal to rectify them were the moving force behind the deprivation of Donnie Sanders' constitutional rights.

119. Plaintiff seeks all available wrongful death and survival damages under the law.

WHEREFORE, Plaintiff demands judgement in her favor, and against Defendants Tolbert, Dean, Wagner, Lucas, and Garrett pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million dollars, including interest, delay damages, costs of suit, general and specific damages, attorneys' fees under U.S.C § 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

Respectfully submitted,

**KRAUSE AND KINSMAN, LLC**

/s/ Robert L. Kinsman
Adam Krause, Esq. (MO #67427)
Robert L. Kinsman, Esq. (MO #67462)
4717 Grand Ave. #300
Kansas City, MO 64112
816-200-2900
816-760-2800 (fax)
adam@krauseandkinsman.com
robert@krauseandkinsman.com

*and*

MCELDREW YOUNG PURTELL MERRITT
S. Lee Merritt, Esq.
Daniel N. Purtell, Esq.
John J. Coyle, Esq.
Mark V. Maguire, Esq.
123 South Broad Street
Suite 2250
Philadelphia, PA 19109
215-545-8800
lee@mceldrewyoung.com
dan@mceldrewyoung.com
jcoyle@mceldrewyoung.com
mmaguire@mceldrewyoung.com
*Pro Hac Vice Motions Forthcoming

*Attorneys for Plaintiff*